UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| **GILLIAN BERGER, et al.,** | ) |
| | ) |
|   **Plaintiffs,** | ) |
| | ) |
|     vs. | ) Cause No. 1:14-cv-1710-WTL-MJD |
| | ) |
| **NATIONAL COLLEGIATE ATHLETIC** | ) |
| **ASSOCIATION, et al.,** | ) |
| | ) |
|   **Defendants.** | ) |

## ENTRY ON MOTIONS TO DISMISS AND RELATED MOTIONS

    The three Plaintiffs in this case are or were at one time[1] members of the women's track and field team at the University of Pennsylvania ("Penn"). They allege in their Amended Complaint that, by virtue of their participation on the team, they are employees of Penn for purposes of the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"). Therefore, they allege, they are entitled under the wage-and-hour provisions of the FLSA to be paid at least minimum wage for the work they perform as student athletes. They have named as Defendants the National Collegiate Athletic Association ("NCAA") and 123 NCAA member schools[2] that field Division I athletic teams. They have asked the Court to certify this case as a collective action, proposing a class of "[a]ll current and former NCAA Division I student athletes, on

---

    [1]For ease of reading, for the remainder of this Entry the Court will use the present tense when referring to the Plaintiffs' participation in student athletics, although at least one of the Plaintiffs is no longer a student athlete at Penn and the Plaintiffs wish to certify a collective action that includes both current and former student athletes.

    [2]The original complaint in this case also named as defendants various public institutions of higher learning; those defendants were voluntarily dismissed by the Plaintiffs and not included in the Amended Complaint, presumably because the Plaintiffs determined that they enjoy immunity under the Eleventh Amendment. A few other defendants have been voluntarily dismissed since the filing of the Amended Complaint for reasons that do not appear in the record.

NCAA women's and men's sports rosters for the [Defendant schools] . . . from academic year 2012-13 to the present,"[3] a group which the Plaintiffs define as the "Student Athlete Collective."[4] All of the remaining Defendants in this case now ask the Court to dismiss this case. The various motions are fully briefed and the Court, being duly advised, rules as follows.

## I.  PRELIMINARY MATTERS

Some collateral motions pend before the Court. First, some of the Defendants moved for oral argument; those motions **[Dkt. Nos. 181 and 191]** are **DENIED**.

Next, some of the Defendants move to strike certain paragraphs of the Amended Complaint because they refer to the Plaintiffs' pre-suit settlement attempts in this case. *See* Federal Rule of Civil Procedure 12(f) (court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter"). The Court is at a loss to understand why Plaintiffs' counsel chose to plead allegations about counsel's pre-suit communications with the NCAA. In fact, the Plaintiffs do not allege certain facts in the Amended Complaint (such as the ways in which NCAA regulated sports are different than other extracurricular activities) at all, but rather allege only that Plaintiffs' counsel "elaborated in response to the NCAA" that such facts existed. It is unclear whether counsel lacked a good faith basis to actually assert the facts as true or whether counsel had some other reason for drafting the complaint in such a strange manner. Either way, it is wholly irrelevant what Plaintiffs' counsel told the NCAA before filing suit and vice versa, and the motion to strike those allegations (found in Amended Complaint ¶¶ 1, 59-67) is granted.

---

[3] Briefing on the certification issue has not yet been completed.
[4] The Court will use the term "student athletes" to refer to the members of the putative class.

Finally, the Plaintiffs filed a motion for leave to file a surreply [Dkt. No. 218]. That motion is **DENIED**. A surreply might well have been appropriate in this case, given (as discussed below) that the district court's ruling in one of the cases relied upon by the Plaintiffs was reversed by the Second Circuit during the course of the briefing of the instant motions. Unfortunately, however, the Plaintiffs did not seek to file a surreply to address that case, or any other relevant issue. Instead, the Plaintiffs sought to impeach some of the Defendants' counsel by informing the Court that they or members of their law firms have written web postings or given seminars in which they have taken legal positions that the Plaintiffs characterize as contrary to positions they take on behalf of their clients in this case. Plaintiffs complain in their proposed surreply that defense counsel "have not deemed [it] necessary to" disclose this "contrary guidance" to the Court. Dkt. No. 218-1. Even if the Plaintiffs' characterization of the guidance in the publications as "contrary" to the position taken in this case were accurate—and it is not, for the reasons aptly pointed out by the Defendants in their reply briefs—the Court is unaware of any rule of law that would make it necessary, or even advisable, for a lawyer to cite to his or her law firm's own publications as either authority for, or possible authority against, a legal principle. There is simply nothing at all improper about the conduct the Plaintiffs complain about in their proposed surreply; accordingly, the surreply would serve no useful purpose.

## II. STANDING TO SUE DEFENDANTS OTHER THAN PENN

The Defendants argue that the Plaintiffs lack standing to sue any Defendant other than Penn, the school they all attend. Because standing is a matter of subject matter jurisdiction, the Court must address that argument first.

> Article III of the Constitution limits federal judicial power to certain "cases" and "controversies," and the irreducible constitutional minimum of standing contains three elements. To establish Article III standing, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or

3

> imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. As the party invoking federal jurisdiction, a plaintiff bears the burden of establishing the elements of Article III standing.

*Silha v. ACT, Inc.*, 807 F.3d 169, 172-73 (7th Cir. 2015) (internal citations and quotations marks omitted). Here the Defendants make a facial challenge to standing. "[W]hen evaluating a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court should use *Twombly–Iqbal's* 'plausibility' requirement, which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174. Thus, the question is whether the well-pleaded factual allegations in the Amended Complaint "plausibly suggest a claim of subject matter jurisdiction," *id.*, with regard to the Defendants other than Penn.

The Plaintiffs assert claims under the FLSA. They wisely do not dispute that they have standing to assert an FLSA claim against an entity only if that entity is their employer for purposes of the FLSA. The Plaintiffs do not allege in the Amended Complaint that each of the Defendants is their employer; rather, they expressly allege that the Defendants employ those students "participating in their respective NCAA athletics programs." Dkt. No. 119 at ¶ 84; *see also id.* at ¶ 83 ("Plaintiffs and the members of the Student Athlete Collective have been, and continue to be, employees of their respective Defendant NCAA Division I Member Schools within the meaning of 29 U.S.C. § 203(e).").

The Court agrees with the Defendants that the Amended Complaint fails to allege that the Plaintiffs are employees of any Defendant other than Penn. The Plaintiffs assert in their brief in response to the Defendants' motions that all of the Defendants are liable to them under the FLSA under a joint employer theory. While "nothing prevents a plaintiff opposing dismissal from elaborating on the complaint or even attaching materials to an opposition brief illustrating the

4

facts the plaintiff expects to be able to prove," *Defender Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 335 (7th Cir. 2015), joint employment is not mentioned in the Amended Complaint, and the only fair reading of the Amended Complaint is that the Plaintiffs are alleging that they are employees of only Penn, not of the other Defendants.  Therefore, the arguments in the Plaintiffs' briefs do not elaborate on the facts in the complaint; they contradict them.  The well-pleaded facts in the Amended Complaint do not plausibly suggest that the Plaintiffs have standing to sue any Defendant other than Penn.  Accordingly, all of the Defendants other than Penn are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

### III.  THE PLAINTIFFS' CLAIMS AGAINST PENN

The Defendants move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint in its entirety, arguing that the Plaintiffs fail to state a claim against any of them under the FLSA.  The Court will consider the Defendants' arguments as they relate to the Plaintiffs' claims against the remaining Defendant, Penn.

As alluded to above, the applicable standard for evaluating a motion to dismiss for failure to state a claim is as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.
>
> To assess whether a complaint states a plausible claim of relief, the Court articulated a two-pronged approach in which a court (1) first identifies the well-pleaded factual allegations by discarding the pleadings that are "no more than conclusions" and (2) then determines whether the remaining well-pleaded factual allegations "plausibly give rise to an entitlement of relief."

*Silha*, 807 F.3d at 173-74 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

The Plaintiffs' claims hinge on whether they are properly characterized as "employees" of Penn under the FLSA. The Plaintiffs make what is essentially a fairness argument, accusing the Defendants of taking the position that "student athletes are less deserving of employee status and pay, under the FLSA, than work study participants, 'who work at food service counters or sell programs at athletic events, or who wait on tables or wash dishes in dormitories,'" all of whom are designated as employees by the United States Department of Labor. Dkt. No. 212 at 2 (quoting U.S. Department of Labor Field Operations Handbook § 10b24(b) (10/20/93)). But, of course, the question is not whether the Plaintiffs, as student athletes, are "deserving" of employee status, but rather whether Congress intended for the FLSA to apply to them.[5]

## A. Employment Under the FLSA Generally

The FLSA "defines 'employee' in a circular fashion, as 'any individual employed by an employer.'" *Vanskike v. Peters*, 974 F.2d 806 (7th Cir. 1992) (quoting 29 U.S.C. § 203(e)(1)). "Employ," in turn, is defined by the Act as "to suffer or permit to work." 29 U.S.C. § 203(g). "Work" is not defined.

"Because status as an 'employee' for purposes of the FLSA depends on the totality of circumstances rather than on any technical label, courts must examine the 'economic reality' of the working relationship." *Vanskike*, 974 F.2d at 808 (citations omitted).

> For purposes of social welfare legislation, such as the FLSA, employees are those who as a matter of economic reality are dependent upon the business to which they render service. In seeking to determine the economic reality of the nature of the working relationship, courts do not look to a particular isolated factor but to all the circumstances of the work activity. Certain criteria have been developed to

---

[5]This ruling should not be read as expressing any opinion regarding the broader question about whether, as a matter of philosophical principle or general fairness, college athletes in general, or particular groups of college athletes whose teams generate substantial revenue, should be compensated in some way. This case is not the proper forum for resolving that societal debate.

>assist in determining the true nature of the relationship, but no criterion is by itself, or by its absence, dispositive or controlling.

*Secretary of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir. 1987) (internal citations and quotation marks omitted).

### B. The Intern Fact Sheet Test Does Not Apply to This Case

The Plaintiffs argue that the question of whether student athletes are employees under the FLSA is governed by the test set forth in a 2010 United States Department of Labor "fact sheet" for determining whether certain internships qualify as employment under the FLSA. *See* DOL, Wage & Hour Div., Fact Sheet # 71, Internship Programs Under The Fair Labor Standards Act (April 2010), http://www.dol.gov/whd/regs/compliance/whdfs71.pdf (hereinafter referred to as the "Intern Fact Sheet").[6] The stated purpose of the Intern Fact Sheet is to "provide[] general information to help determine whether interns must be paid the minimum wage and overtime under the Fair Labor Standards Act for the services they provide to "for-profit," "private sector

---

[6]The Plaintiffs' suggestion that defense counsel violated their ethical obligations by not discussing the Intern Fact Sheet in their opening briefs is entirely without merit. On its face, the Intern Fact Sheet applies to internships. This case does not involve internships. It is the Plaintiffs' legal theory that (1) the criteria set forth in the Intern Fact Sheet should be applied to student athletes; and (2) the application of those criteria would dictate a finding that student athletes are employees under the FLSA. Whatever the merits of that legal theory, it is disingenuous to suggest that it is of such obvious merit that the Defendants were ethically obligated to address it in their opening briefs. Indeed, while the Plaintiffs assert that "on the face of the Amended Complaint, DOL Fact Sheet #71 is the clear basis for Plaintiffs' claim of student athlete employee status under the FLSA" and "DOL Fact Sheet #71 is referenced as the source of criteria that establish that both student participants in work study programs, and student athletes, are employees under the FLSA," Dkt. 212 at 10, in fact, the Intern Fact Sheet is referenced only once in the Amended Complaint, in a "see, e.g." cite in support of the proposition that "work study participants meet criteria for recognition as temporary employees under the FLSA, and NCAA Division I Member Schools must, and do, pay work study participants at least the federal minimum-wage of $7.25 an hour." The Amended Complaint can best be summarized as arguing that because students in work-study programs are treated as employees under the FLSA, student athletes should be as well. Interns—who, again, are the sole focus of the Intern Fact Sheet—are not mentioned in the Amended Complaint at all.

7

employers." It provides that such an internship is not subject to the FLSA if all of the following factors are satisfied:

1. The internship, even though it includes actual operation of the facilities of the employer, is similar to training which would be given in an educational environment;

2. The internship experience is for the benefit of the intern;

3. The intern does not displace regular employees, but works under close supervision of existing staff;

4. The employer that provides the training derives no immediate advantage from the activities of the intern; and on occasion its operations may actually be impeded;

5. The intern is not necessarily entitled to a job at the conclusion of the internship; and

6. The employer and the intern understand that the intern is not entitled to wages for the time spent in the internship.

*Id.*

The Plaintiffs frame this case as "a case of first impression . . . applying the criteria set forth in [the Intern Fact Sheet] to the question of student athlete employee status for the first time." Dkt. 212 at 4. The problem with this framework is twofold: the Intern Fact Sheet is not intended to apply to student athletes and, in any event, courts have refused to apply the test contained in the Intern Fact Sheet even to interns.

First, the factors set forth in the Intern Fact Sheet were not designed to apply to student athletes, and there is nothing to suggest that the Department of Labor intended them to be applied outside of the internship context. The Plaintiffs argue that the criteria set forth in the Intern Fact Sheet comprise "the relevant standard for determining employee status in an educational setting," Dkt. No. 212 at 10, but that argument wholly mischaracterizes the Intern Fact Sheet, which, on its face, does not purport to address activities that take place "in an

8

educational setting" at all. Rather, it expressly addresses internship programs that take place at the facilities of for-profit private sector employers.[7] Unlike student athletes, the interns in such programs are working (in the broadest sense of the word) for entities that employ others to do the same type of work for compensation. Thus, they are in a traditional employment setting, not an educational setting; in order for them not to be considered employees, there must be some way to distinguish them from the employees with whom they may be working side-by-side.[8]

The test set forth in the Intern Fact Sheet has its origin in *Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947), which involved railroad brakemen trainees who trained by working side-by-side with experienced brakemen on operating trains. The Court recognized that the extremely broad definition of "employ" in the FLSA could be read to cover virtually any situation:

> Section 3(g) of the Act defines "employ" as including "to suffer or permit to work" and § 3(e) defines "employee" as "any individual employed by an employer." The definition "suffer or permit to work" was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another. Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages. So also, such a construction would sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit. But there is no indication from the legislation now before us that Congress intended to outlaw such relationships as these. The Act's purpose as to wages was to insure that every person whose employment contemplated compensation

---

[7]Indeed, the first criteria set forth in the Intern Fact Sheet is that the internship "is similar to training which would be given in an educational environment."

[8]The Plaintiffs argue that "the substance of the employee criteria set forth in DOL Fact Sheet #71, or in the Second Circuit's primary beneficiary test, matter far more than if one person meeting such employee criteria is styled as an intern, work study participant or student athlete." Dkt. 236 at 2 n.1. That is true, to the extent that a person is in a position to which the Intern Fact Sheet criteria are relevant; obviously, an employer could not avoid a rule that applied to interns by calling all of its interns "student athletes." But that begs the question of whether the test that applies to interns at for-profit private sector employers is properly applied to student athletes, given the many obvious, and material, differences between the two situations.

> should not be compelled to sell his services for less than the prescribed minimum wage. The definitions of "employ" and "employee" are broad enough to accomplish this. But, broad as they are, they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction.

*Portland Terminal*, 330 U.S. at 152. In the case of the brakeman trainees, the Court found that they were not employees of the railroad for FLSA purposes. In so finding, the Court noted several facts that were relevant to its determination, including (1) the training was necessary before a person could be hired as a brakeman, and "[a]n applicant for such jobs is never accepted until he has had this preliminary training"; (2) the trainees did not displace any of the railroad's regular employees, "who do most of the work themselves, and must stand immediately by to supervise whatever the trainees do"; (3) "[t]he applicant's work does not expedite the company business, but may, and sometimes does, actually impede and retard it"; (4) the training provided by the railroad was the type that was provided by a vocational school; and (5) the trainees did not expect to receive any compensation and would not necessarily be hired by the railroad after successfully completing the training. *Id.* at 149-50.

In the Intern Fact Sheet, the DOL unequivocally acknowledges that some interns are employees and some are not. It endeavors to distill the factors considered relevant by the Supreme Court in *Portland Terminal* into a set of criteria to be applied to determine which category a particular intern falls into. *See Glatt v. Fox Searchlight Pictures, Inc.*, ____ F.3d ____, 2016 WL 284811 (July 2, 2015; amended Jan. 25, 2016) ("As DOL makes clear in its [amicus] brief, its six-part test is essentially a distillation of the facts discussed in *Portland Terminal*.").[9]

---

[9]The Plaintiffs inexplicably take certain Defendants to task for making an argument relating to the Second Circuit's holding in *Glatt* for the first time in their reply brief. *See* Dkt. No. 218-1 at 3 ("In addition, Defendants Duke University and Wake Forest University,

10

That leads to the second problem with the Plaintiffs' argument: appellate courts have long eschewed the test set forth in the Intern Fact Sheet and instead read *Portland Terminal* to require a more flexible test. Long before the Intern Fact Sheet was published, the same test was set forth by the DOL in the Wage and Hour Division's Field Operations Handbook as the test to be used to determine whether a "trainee or student" was an employee. *See Solis v. Laurelbrook Sanitarium & School, Inc.*, 642 F.3d 518, 524 (6th Cir. 2011) (citing *Employment Relationship Under the Fair Labor Standards Act,* WH Pub. 1297 (Rev. May 1980)).[10] In *Solis*, the Sixth Circuit found the test

> to be a poor method for determining employee status in a training or educational setting. For starters, it is overly rigid and inconsistent with a totality-of-the-circumstances approach, where no one factor (or the absence of one factor) controls. *See Rutherford Food [Corp. v. McComb],* 331 U.S. [722,] 730 [1947] ("We think, however, that the determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). Moreover, at least one court has found the test's all-or-nothing approach inconsistent with prior [DOL] interpretations and opinions endorsing a flexible approach, thereby diminishing any persuasive force the test might be entitled to under *Skidmore [v. Swift & Co.*, 323 U.S. 134 (1944)].[11] *See [Reich v. Parker Fire Protection Dist.,* 992 F.2d [1023,] 1026 [10th Cir. 1993]. Furthermore, the test is inconsistent with *Portland Terminal* itself, which, as outlined below, suggests that the ultimate inquiry in a learning or training situation is whether the

---

represented by Ogletree Deakins, assert in their Reply Brief, at 2, *for the first time,* that the Second Circuit's recent ruling in [*Glatt*], referenced in Plaintiffs' [First] Notice of Supplemental Authority, forecloses collective certification."). In light of the fact that the opinion was handed down by the Second Circuit only twelve days prior to the date the reply brief at issue was filed, and some two months *after* the Defendants' original briefs were filed, it is difficult to see how the Defendants could have been expected to make the argument any earlier.

[10]The same standards for "trainees and student-trainees" is found in the Wage & Hour Div., U.S. Dep't of Labor, *Field Operations Handbook* Ch. 10, ¶ 10b11 (Oct. 20, 1993), http://www.dol.gov/whd/FOH/FOH_Ch10.pdf.

[11]In *Skidmore*, the Supreme Court established the rule that nonregulatory guidelines of agencies such as the DOL, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140.

> employee is the primary beneficiary of the work performed. While the Secretary's six factors may be helpful in guiding that inquiry, the Secretary's test on the whole is not.

*Solis*, 642 F.3d at 525 (6th Cir. 2011) (footnote added). The Sixth Circuit, like the Tenth Circuit before it, declined to follow the test established by the DOL. The Sixth Circuit held that

> the proper approach for determining whether an employment relationship exists in the context of a training or learning situation is to ascertain which party derives the primary benefit from the relationship. Factors such as whether the relationship displaces paid employees and whether there is educational value derived from the relationship are relevant considerations that can guide the inquiry. Additional factors that bear on the inquiry should also be considered insofar as they shed light on which party primarily benefits from the relationship.

*Id.* at 529. Other courts have similarly refused to follow the DOL's test in favor of a more flexible primary benefit test for determining whether a trainee is an employee under the FLSA. *See Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199 (11th Cir. 2015) (collecting cases).

The Intern Fact Sheet took the trainee test at issue in *Solis* and applied it—without material modification—to interns in the for-profit private sector. In *Glatt*, the Second Circuit, like the Sixth Circuit in *Solis*, rejected the DOL's rigid approach. The court first noted that "[u]nlike an agency's interpretation of ambiguous statutory terms or its own regulations, an agency has no special competence or role in interpreting a judicial decision" and therefore the DOL's interpretation of *Portland Terminal* was entitled to, at most, *Skidmore* deference "to the extent we find it persuasive." *Glatt*, 2016 WL 284811 at *5 (citation omitted). It then found it not persuasive because "the DOL test attempts to fit *Portland Terminal*'s particular facts to all workplaces, and because the test is too rigid for our precedent to withstand." *Id.*

Instead of applying the test set forth in the Intern Fact Sheet, the Second Circuit held that "the proper question is whether the intern or the employer is the primary beneficiary of the

12

relationship" and set forth the following "set of non-exhaustive factors" to be used to answer that question:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation. Any promise of compensation, express or implied, suggests that the intern is an employee—and vice versa.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment, including the clinical and other hands-on training provided by educational institutions.

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Glatt*, 2016 WL 284811 at *6-7.

Even more recently than *Glatt*, and, indeed, after the briefing of the instant motions was complete, the Eleventh Circuit examined the application of the DOL's test for trainees in *Schumann*, 803 F.3d 1199. Like the courts before it, the Eleventh Circuit

> [did] not defer to this test because, with all due respect to the DOL and the important work that it does, we do not find it persuasive. First, "an agency has no special competence or role in interpreting a judicial decision." *Glatt v. Fox Searchlight Pictures, Inc.,* 791 F.3d 376, 383 (2d Cir.2015) (citation omitted). Second, as the Second Circuit has observed, the test "attempts to fit *Portland Terminal*'s particular facts to all workplaces, and ... is too rigid...." *Id.* Third, while some circuits have given some deference to the test, no circuit has adopted it wholesale and has deferred to the test's requirement that "all" factors be met for a trainee not to qualify as an "employee" under the FLSA. In short,

> we prefer to take our guidance on this issue directly from *Portland Terminal* and not from the DOL's interpretation of it.

*Schumann*, 803 F.3d at 1209. *Schumann* involved a clinical program for student registered nurse anesthetists that fulfilled a requirement under Florida law for the students to eventually become certified registered nurse anesthetists. Both the court in *Glatt* and the court in *Schumann* recognized that the facts of *Portland Terminal*—a 68-year-old case—"do not necessarily reflect the role of internships in today's economy," the latter a bit more colorfully:

> We add to these points the significant fact that the training involved in *Portland Terminal* was not a universal requirement for a particular type of educational degree or for professional certification or professional licensure in the field. Instead, the *Portland Terminal* training was offered by a company for its own, specific purposes, to create a ready labor pool for itself. So trying to evaluate the program at issue here by comparing it to all of the facts from *Portland Terminal* that were relevant and helpful to assessing the training program at issue in that case, is like trying to use a fork to eat soup. Like the fork and the spoon, the training at issue in *Portland Terminal* and in the case under review have similarities and may be in the same general category (eating utensils and training programs). But comparison to the facts from *Portland Terminal* alone can cover the gamut of relevant considerations in a case like the one before us no better than a fork can do a spoon's job in ladling soup.

*Schumann*, 803 F.3d at 1210-11. The court then went on to adopt the factors set forth by the Second Circuit in *Glatt*, which it found "effectively tweak the Supreme Court's considerations in evaluating the training program in *Portland Terminal* to make them applicable to modern-day internships like the type at issue here" and noting that

> [u]nder the Second Circuit's approach, "no one factor is dispositive and every factor need not point in the same direction for the court to conclude that the intern is not an employee...." Rather, courts must engage in a "weighing and balancing [of] all of the circumstances," including, where appropriate, other considerations not expressed in the seven factors.

*Id.* at 1212 (quoting *Glatt*, 791 F.3d at 384).

Although there does not appear to be any Seventh Circuit case on this precise issue, the consistent holdings of other circuits convince the Court that the Plaintiffs' position in this case is

untenable. The Intern Fact Sheet test is not a proper distillation of *Portland Terminal*; rather, that case requires a flexible approach that considers the totality of the circumstances. Accordingly, there is not even one set of immutable factors that applies to all interns in all situations, and there is certainly not one test that applies equally to interns and student athletes.

### C. The Proper Inquiry

The Seventh Circuit's general approach to determining who is an employee under the FLSA is also a flexible one. In *Vanskike*, 974 F.2d at 808, for example, the Seventh Circuit held that the four-factor test that had been applied by other courts to determine if prisoners working for outside employers were employees for FLSA purposes was not appropriate in the context of work done by prisoners within the prison because the two situations were "quite different." Those factors, the court said, "primarily shed light on just one boundary of the definition of 'employee,' and we are concerned with a different boundary." *Id.* at 809. Accordingly, the Seventh Circuit examined the economic reality of the situation at hand and determined that prisoners working within a prison as part of their sentences are simply not employees under the FLSA. The fact that a literal application of the four-factor test would point to a different result was not relevant because those factors "fail to capture the true nature of the relationship" between a prison and prisoners who work in it.

So, too, do the factors used in the trainee and private-sector intern context fail to capture the nature of the relationship between the Plaintiffs, as student athletes, and Penn. The Supreme Court has recognized that there exists in this country a "revered tradition of amateurism in college sports," *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 120 (1984), a fact that cannot reasonably be disputed. That tradition is an essential part of the "economic reality" of the relationship between the Plaintiffs and Penn. So, too, is the fact

that generations of Penn students have vied for the opportunity to be part of that revered tradition with no thought of any compensation.[12] This demonstrates unequivocally that the students at Penn who choose to participate in sports—whether NCAA sports, club sports, or intramural sports—as part of their educational experience do so because they view it as beneficial to them. Indeed, millions of Americans participate in amateur sports in countless contexts; they do so for myriad reasons, none of them, by definition, involving monetary compensation, but all of them, it is fair to assume, involving benefit of some sort to the participants—enough benefit to justify the amount of effort the participants choose to put into it.

Also supporting a finding that student athletes are not employees for FLSA purposes is the fact that the existence of thousands of unpaid college athletes on college campuses each year is not a secret, and yet the Department of Labor has not taken any action to apply the FLSA to them. *Cf. Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 510-11 (7th Cir. 2007) ("The system of compensation used by Sterling is industry-wide, and of long standing. . . . It is possible for an entire industry to be in violation of the Fair Labor Standards Act for a long time without the Labor Department noticing. But a more plausible hypothesis is that the auto repair industry has been left alone because the character of its compensation system has been recognized for what it is—a bona fide commission system."). To the contrary, the DOL has expressly taken the position that

> [a]s part of their overall educational program, public or private schools and institutions of higher learning may permit or require students to engage in activities in connection with dramatics, student publications, glee clubs, bands, choirs, debating teams, radio stations, intramural and interscholastic athletics and other similar endeavors. Activities of students in such programs, conducted

---

[12]In addition to not being paid wages, students at Penn and other Ivy League schools do not receive athletic scholarships. *See* http://www.sfs.upenn.edu/paying/paying-grants-scholarships.htm ("Like other Ivy League schools, Penn does not award scholarships based on academic or athletic merit.") (last visited Feb. 16, 2016).

16

>primarily for the benefit of the participants as part of the educational opportunities provided to the students by the school or institution, are not "work" [under the FLSA] and do not result in an employee-employer relationship between the student and the school or institution. Also, the fact that a student may receive minimal payment for participation in such activities would not necessarily create an employment relationship.

U.S. Department of Labor, Wage and Hour Division, Field Operations Handbook § 10b03(e) (Oct. 20, 1993) ("§ 10b03(e)"). The Plaintiffs argue that the DOL did not intend for this to apply to NCAA regulated sports:

>[O]n its face, [§ 10b03(e)] *neither* mentions NCAA regulated sports in name, *nor* by example, although NCAA regulated sports were inarguably sufficiently popular, and well-recognized, in 1993 to bear such mentioning if intended. In fact, deductive reasoning suggests that NCAA regulated sports were clearly *not* intended to be covered by [§ 10b03(e)] and Defendants have offered no evidence[13] to contradict that fact as alleged in the Amended Complaint.

Dkt. No. 212 at 5-6 (emphasis in original).[14] While § 10b03(e) is not dispositive of the issue, the Court disagrees with the Plaintiffs' "deductive reasoning." "Interscholastic" means "existing or done between schools." Merriam-Webster (2016) http://www.merriam-webster.com/dictionary/interscholastic. NCAA regulated sports fall squarely within that definition. Given the popularity of NCAA regulated sports, the DOL could not have contemplated the issue of students engaging in sports on college campuses without being aware that many of the students engaged in "interscholastic sports" are NCAA athletes. Therefore, it is logical to infer that if the

---

[13]It is not clear why the Plaintiffs believe the Defendants had an obligation—or indeed an opportunity—to offer evidence in conjunction with their motion to dismiss for failure to state a claim.

[14]The Plaintiffs discuss many ways in which they believe things like choirs and intramural sports are different from NCAA sports. The activities listed in § 10b03(e) are all different from one another, and all of them—including sports—can be pursued on college campuses with widely varying degrees of structure, commitment, and oversight by and support of the schools themselves. The DOL undoubtedly knew this when it determined that participants in all such extra-curricular activities were not employees under the FLSA. If variables like staff oversight, the availability of credit, and compulsory attendance were relevant to the inquiry, it is reasonable to assume that the DOL would have said so.

17

DOL did not mean to include those athletes, but was speaking only of athletes engaged in other types of interscholastic sports, it would have said so.

The economic reality of the situation and the DOL's position on the issue both point to one conclusion: the fact that the Plaintiffs participate in an NCAA athletic team at Penn does not make them employees of Penn for FLSA purposes. Because the Court has made this determination as a matter of law, rather than on the basis of a deficiency in the facts pled by the Plaintiffs, it would be futile to permit the Plaintiffs to amend their complaint to assert additional facts. Accordingly, the Court will enter judgment in favor of Penn.

## IV. CONCLUSION

The Defendants' motions to dismiss (Dkt. Nos. 178, 180, 182) are **GRANTED** as to all Defendants that have not been dismissed by the Plaintiffs.[15] The Plaintiffs' claims against Defendant the University of Pennsylvania are **DISMISSED WITH PREJUDICE**, and the Plaintiffs' claims against all remaining Defendants are **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction. The Defendants' motions for oral argument (Dkt. Nos. 181 and 191) are **DENIED**. The Plaintiffs' motion for leave to file a surreply (Dkt. No. 218) is **DENIED**. The motions to strike filed by Defendants Duke University and Wake Forest University (Dkt. Nos. 173 and 174) are **DENIED AS MOOT**. In light of these rulings, the Plaintiffs' motion to conditionally certify a class (Dkt. No. 234) is **DENIED AS MOOT**.

---

[15]All of the remaining Defendants have either filed a motion to dismiss or joined in the motions filed by other Defendants.

SO ORDERED: 2/16/16

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification